You may be seated. This is our next case of the afternoon. Aughenbaugh v. Decatur Memorial Hospital. You may be seated. 413-0337 for the appellant, Mr. Lynch, for the appellant, Mr. Jackson. You may proceed. Good afternoon. My name is Frank Lynch. I appear for the plaintiff in this case, the appellant. Mr. Aughenbaugh was injured in September of 2005 at a defendant's premises. He worked on air handling units. He received a call at his home from his employer, which was Bodine Electric. They asked him to go to Decatur Memorial Hospital and work on an air handling unit that had some problems. One of the electric fans in an air handling unit had stopped working, and he was asked to go and do some work to replace the air handling unit at the hospital. When he arrived at the hospital, he was taken into the room, and he confronted a situation that has to be explained in order for the court to understand, I think, what exactly happened. Think of a large room with air handling equipment in it, and people can walk into it, and assume that there are two parallel duct works. One has an air handling unit on one side with a fan that blows air toward the hospital, and another duct work that's parallel to it also has an air handling unit and a fan that blows air toward the hospital. And those two fan units come together into one piece of duct work, and that blows down into the hospital. And in this case particularly, it was the intensive care unit. What had happened is that one of the fans had stopped working. The breaker, the circuit breaker was tripping out, so that there was some kind of electrical problem. And Bodine, being an electrical contractor, had been called to fix that. Unbeknownst to Mr. Offenbach at the time, however, the layout of that duct work and the fact that it was shaped like a Y with two pieces of duct work going down and joining created an unseen danger. And the unseen danger was that if one of the fans wasn't working, the other fan would continue to blow, but a backflow event would happen, and would make the non-operative fan turn and spin in the opposite direction. The real problem is that that was not apparent and couldn't be apparent to anybody coming onto the scene and observing that without any knowledge of it. Mr. Offenbach was asked to come in and take a look at the fan. He came in and was taken in by the site supervisor, Mr. Stadzel. They looked at the fan, and it was determined that that fan had to be replaced. Mr. Offenbach was told by the hospital personnel and the superintendent who was on the scene, and the person from the hospital that contacted him, that they had to leave the one blower on so that air would continue to go down into the ICU while they replaced the blower on the other side. It was unknown, however, again, it was unknown to Mr. Offenbach, that by leaving one blower on, air would backflow up into the other fan and cause that to spin in the opposite direction. Mr. Offenbach contacted his supervisor from Bodine, and that individual came in. Again, the two of them talked to Mr. Stadzel, the hospital's employee, and Mr. Stadzel again told them, you've got to leave this blower on. You can't turn it off. You've got to do this in essence while air is still being forced down into the ICU. The plaintiff and his supervisor from Bodine went to get the hospital's tools. That's an important point, I think. They had to get tools and a pulley wrench, a device that's used to pull pulleys off of the machine, to accomplish the job. They went and got the hospital's tools. They were taken there by the hospital supervisor. They came back. They asked the supervisor, look, can we do this tomorrow? If we can do this tomorrow, we won't have to do it in such a hot and urgent situation. We'll be able to take our time with it. He said, no, no, it's got to be done now, and you must do it while the other fan is working. Mr. Offenbach went to take the guard off so he could replace the motor, and immediately, because the fan was spinning backwards as a result of the backflow of air, his hand got caught in a pulley that was turning the fan. It was spinning in the opposite direction unbeknownst to him, and he sustained a serious injury. On behalf of Mr. Offenbach, we file the complaint in the circuit court. The complaint brought causes of action under section 414 of the restatement, retained control by the property owner. And the allegation was, by the nature of what the property owner told him, what they knew and what they didn't know, and what they required him to do, they were liable. You see, there's an essential fact that's part of this that raises the issue about liability under the restatement section 414, and that essential fact is this. The folks at the hospital knew that there was a damper on the non-functioning ductwork, so that if they reached over and pulled that lever, they could actually stop air from backflowing up into the fan and making it spin backwards. Hospital personnel knew that, the hospital maintenance people knew that, and one of the hospital employees that was present knew not only that the backflow would cause the fan to spin backwards, but that that condition presented a danger to people and it could be eliminated by simply pulling the damper and closing off that part of the ductwork. That was one of the facts that supported our claim for relief under section 414 of the restatement. Section 414 says, one who entrusts work to an independent contractor, and there's no doubt that Bodine was such, but who retains control over any part of the work remains liable. That was adopted by Larson v. Commonwealth Edison, and it's articulated pretty clearly in the Illinois Pattern Instruction 55.02, which reads, a party who retains some control over the safety of the work has a duty to exercise that control with ordinary care. The allegations of the complaint were, in essence, you told us that that one part of the ductwork had to be left on, you told us that we had to replace the non-functioning motor while air was being blown into the ICU, you didn't tell us air was backflowing and you knew it, and also there was a damper present. And had you operated the damper or told us about it, we could have stopped the dangerous condition from happening. If you'd have told us that the fan would backflow and spin backwards, we could have done something about it. You instructed us, however, how to do this job in a very specific way, with your tools, on your timeline, and in a very hurried way. People that own property have a right to say we need this done right away, but they have to accept the consequences of that, I think. You mean if I'm a homeowner and I tell a guy I've got to have this fixed today, I'm not responsible for his doing it in a fashion that he hurts himself? Not by itself, no. Isn't that what you just said? No, well, I may have, and if I did, then I misspoke. I think that if you're a homeowner and you say I need this done right away, and as a result, I don't want you to turn off the power to the house to do it. I want you to do this while the socket's hot. I need the electricity in my bathroom right away, and I'm also doing some work in the basement, so you can't turn the power off to the house, you have to work on it hot. If I, as a property owner, have the position and authority to tell a subcontractor or somebody who's working on my house to do it that way, and that they follow my instructions, then by following my instructions, I may have assumed liability for what happens to them. I think that in this case what happened is, and part of what we allege, is that the property owner gave him specific instructions about doing it quickly in a very specific way, and at the same time, failing to tell him that there was a damper available that could close off the dangerous problem. Now, I think the law under Section 414 has been well articulated and debated by the courts, and I think each one of the justices who sit here today have been on cases involving retained authority by a landowner. But if not, I think that there's a plethora of cases, and I think one of the best places to start research on it is with the Illinois Pattern of Instruction. It gives a good discussion of it, it outlines the cases to look at, and we sort of follow that and track that in our briefing material. Pasco v. Commonwealth Medicine set an early standard, and it says the retained power includes power to forbid work from being done in a manner likely to be dangerous. Forbid work so that it's done in a manner that's likely to be dangerous. You can't shut this blower off, it must be left on while you work on the other piece of ductwork. In Frist v. Personal Products, if the property owner maintains control over operative details or routine and incidental aspects of the work, don't do it like this, do it like that instead, then that's enough retained control and retained authority to subject them to liability if, by giving those instructions, they create a danger for the worker. I think that's really the framework to think about this in. If the property owner can give instructions so as to create a danger, they open themselves up to a problem. These are all cases that are cited in materials, and they all come up with similar rules. Defense counsel has written an excellent brief, and his materials before the trial court were also excellent, and they talk about the nature of the control that has to be exerted for liability to be imposed. And he's right, all of those cases are held, he represented their holdings to the court accurately. So what we have is we have a framework for the court to analyze facts on an individual basis. That was our first theory. The second theory of liability was based on the provisions of the restatement, which are Section 343, and that was an ordinary property owner's liability kind of analysis. Section 343 was part of our complaint in the case, and we alleged liability under the theory that a possessor of land can be held liable for physical harm caused to invitees by a condition on his land if he knows or by the exercise of reasonable care would discover the condition. There's evidence they knew of the condition. Should realize it involves an unreasonable risk of harm. There's evidence of that. Should expect that they won't discover or realize it. In fact, that's what happened here, and the landowner fails to exercise some reasonable care to protect against that danger. And again, there's evidence that that happened here. That's essentially the laws that applies to the case. I think that when the court granted summary judgment in this motion, it made two critical errors. The court granted summary judgment by, and you know the court, much to its credit, it did study the record and it wrote a good order. The order of paragraphs four and five, though, talk about the contract between these two parties and the role that the contract played in his analysis. And defense counsel, again, made a very articulate argument about that and cited good cases that say one of the first places that you look to is a contract to see who retains control. But I think the court lost its way in this case. The reason why I think the court lost its way in evaluating the contract is because the court read the contract quite properly for a detail of what the relationship between the parties should have been. But the court lost its way because he overlooked the fact that that's not really what happened. The contract clearly does say, we're not going to tell you how to do anything. You're going to do it by yourself. You are an independent contractor. You make the decisions on your own. And if it were just the contract and not the facts and the truth of what happened, the court's analysis, I think, would be right on point. But the problem is I think the court lost its way because he failed to look at what really happened. I made the analogy in one of my briefs about how the court said something like this. This accident couldn't have been caused by that guy running a stop sign because I see there was a stop sign there and that means he had to stop. The court overlooked the fact that in this case, even though there was a stop sign, the driver went through the intersection without stopping. In this case, the court noted that there was a contract and he was correct. His analysis of it was accurate. But he failed to note that that's not how the hospital behaved at the time. In fact, the contract showed what should have happened but not what did happen. What did happen is that the hospital exercised some specific control. That was the first error I think the court made. And the second error I think the court made requires us to analyze some facts. But the court, I think, ignored the fundamental principle that one bumps into whenever one is presenting a motion for summary judgment to the appellate court and to the trial court. And that is, when considering a motion for summary judgment, the court is supposed to consider the evidence strictly against the movement and in favor of the non-moving party. Such that if the non-moving party can present evidence of a prima facie case, testimony that shows liability, then the court, I think, is obligated, and by law I think is obligated, to treat that evidence as most favorable to the non-moving party to determine whether or not there's a fair question. I would suggest this. If we review some of the specific pieces of evidence in the case, I think we can come to the conclusion that if we tried this case in front of a jury, and we asked the jury to fill out a special interrogatory that said this. Did you believe the testimony of Tim Offenbaugh and find it credible? And then we asked them a second question. And the second question was, did you believe the testimony of Mike Triola, Trollia, and did you find that credible? If the jury would answer such a special interrogatory, yes, we believed them and we found them credible. I think I would have to win that case. Either the jury would have to find in favor of the plaintiff. And if they didn't, in light of that special interrogatory, I think I could move the court and say this. Judge, I asked for judgment notwithstanding the verdict because they said they believed two witnesses who explained exactly how this accident happened and explained that it would not have happened but for the fact that Offenbaugh didn't know there was a backflow coming up, that piece of ductwork. Did Mayer know? There's no evidence that he did. And he suggested in his deposition testimony that they found out that the air was going back up the ductwork when a subsequent post-accident report was being made. I think that's how Mayer knows. So if the jury says we believed Offenbaugh and, Mr. Justice, we believe Mayer, too. I'll throw a third interrogatory in there. I think they would find that the guys from Bodine who showed up were told, you have to leave that fan on, didn't know that it would backflow into the other fan, and had no way of knowing it would backflow into the other fan. How about Twayla telling Mayer the parallel motor could be shut down in intervals? First said, don't shut it off, and then said, well, it could be shut down in intervals. It would be safe. I think he also suggested, and the testimony of Offenbaugh confirmed, that they didn't want it shut down at all because it was an ICU. But that it could be. Mr. Twayla indicated that it could be. I think that also could be read that it could be turned off entirely. But suggesting to somebody who's on the scene, look, this fan can be turned off is, I think, dramatically different from saying, you can turn it off, therefore. And Stodshill clearly wanted it on, and if we take the evidence in the light most favorable to the plaintiff, Mr. Offenbaugh got clear instructions that they can't turn that off. Why would there be any reference to intervals then? Yeah, it's possible to turn it off, but you can't turn it off. But you can shut it down safely for intervals, and then there won't be any safety issues. You can shut it down an hour at a time. That's what he said. Twayla says that you can do that. If we take that evidence, if we take, again, the light, the evidence in the light most favorable to the plaintiff, though, and we don't weigh evidence, we don't engage in the process of determining who's really right and wrong, I think that there's a case that can be made that there is some evidence precluding summary judgment that they simply couldn't. And I think that that, I think that, I think the trial court lost sight of that. I think, look, I get that there is a real weight of evidence issue here, because there are witnesses that say this is how this happened, and there are witnesses that say they don't. I think the trial judge did a really good job. I think he read everything, but I just think he lost sight of that. And I think that in the process of a similar dialect, perhaps in his own mind, he started to weigh those things. Look, this guy says this, and that guy says that. And I think the second error that the court made is that he decided this case based on a similar rationale. He started to think, look, this guy says one thing, and the other guy says the other. And I understand that, particularly in light of the heavy record in this case. I understand that it's, is that two minutes? I think that, I think that I understand that in view of the heavy record, because it really was enormous. You know, I was going to go through things that Offenbaugh said, things that Torelli has said, but I don't think I have to, because I think you've read that. I would just, in summary, first, thank you for your attention. And the second thing I would do is say, again, I think the trial court made two distinct errors. One is he read the contract, which tells us what the parties should do, but he overlooked what actually they did. The contract says, you know, one guy is not supposed to control the other. But in fact, according to the evidence most favorable of the plaintiff, the people from the hospital told them what to do, and most importantly, most, most importantly, knew that that air could be shut off by pulling a damper, and the guys from Bodine didn't know that. That's why they retained control, and also that's why this was a dangerous instrumentality on their property. That Stodgill and Torelli knew about, but they didn't tell the plaintiff of. That 343 liability also has been overlooked, I think, tremendously. By me, by defense counsel, and by the judge, but that's really a key, too. If you know of a dangerous condition on your premises, and you know that they're not going to figure it out, standing in that room they couldn't tell that the air was circulating, you know that they're not going to figure it out, and you know how to do it, you know how to fix it, you know how to solve the problem, it doesn't cost any money, it doesn't do anything. You just walk over and pull the damper. The law should, and does, impose a burden on the property owner. So I think the court confused the contract, and mostly I think the court weighed evidence instead of finding and deciding the issue based on the evidence most favorable to the defendant. Thank you very much. Thank you. We'll hear from the Honorable Barlow. Mr. Jackson. Thank you, and may it please the court and counsel. Mr. Lynch has given an impassioned argument, but I don't think it's a correct argument. The trial court did not lose its way in this case. The reason the trial court did not lose its way is because the trial court examined the evidence, the depositions on file, the contract that was presented to the court in excerpt form, and correctly determined that this is the classic example of a situation where you have an independent contractor who is in charge of the means and methods for all the work they do at the premises of the landowner, the hospital. There has been no argument made today suggesting that the contract did anything but assign to the contractor, the independent contractor, the sole authority to determine the means and methods by which it would do the work at the hospital. That's not in dispute. There's been no argument made and no dispute made regarding the testimony of everyone deposed in this case when they were asked, did the hospital tell you how to do your job? No. Did the hospital try to control what you did? No. Did you have the right to determine how you were going to do your work? Yes, we did. That's the undisputed testimony. What about the argument that you heard Mr. Lynch make about shutting off the electricity and other aspects of that? Your Honor, that is the only argument that has been made today. In fact, it's really the only argument that's been made from the inception of the case by which the plaintiff seeks to put some sort of responsibility on the defendant and some way to argue that there was some sort of control retained by the hospital. The problem with the characterization made today is that it does not comport with the testimony under oath, and we can look at the plaintiff's own testimony. And I do believe that it bears mentioning this to the court because the characterization given by Mr. Lynch is simply a mischaracterization. Mr. Augenbaugh was called to the hospital to fix the problem. The general maintenance supervisor, Mike Stoddsville, took Tim Augenbaugh to the place where this air conditioning unit was not functioning correctly. He said, here's the problem, fix it. Well, he went into this little room. At this point, Augenbaugh notices there was a companion air conditioning unit that was running, and he says, oh, and that one's running. It was next to the one that was not. And Stoddsville says, yeah, that one's still running. That needs to keep running because that's what's providing the cool air to the ICU. That was the context in which that statement was made. There was never any other discussion about it. And here's the thing. Mr. Augenbaugh never believed that there would be a problem in performing his repair work on the non-functioning air conditioning unit with this other one running. He didn't believe there was any problem with making the repairs. He never talked to Stoddsville or anybody else at the hospital with the idea of, can we turn that down? Because not to turn it off or to do anything with that other one that's running would pose a safety hazard. When he was asked in his deposition, this is the exchange that took place, did any DMH person or employee ever tell you or Chuck Mayer, that was the foreman in charge of Augenbaugh, that even though the power to the malfunctioning motor had been cut, the belts were still spinning? No. You don't have any indication or knowledge that they knew that things were still spinning? I don't know. And then he was asked, neither you nor Chuck Mayer ever told the hospital that to leave the other motor running would have made the repair work unsafe? No. So DMH wasn't even given a chance to shut down the second unit for purposes of safety? Is that right? And he says, no. There was never a discussion between the plaintiff and anybody from the hospital to say, to do this safely we need to shut this second unit down, and then the hospital turns and responds and says, no, you can't do that. Yet that's the characterization that the plaintiff has just made to this court, and it's simply not the correct characterization. So you would say the failure here may have been on the part of the electrical workers not to ask the hospital and find out, or not to explore further as to whether or not they could safely work on it. Absolutely. They are the experts. They are the electrical experts. The hospital is not in the business of doing electrical work. That's why they have this exclusive independent contractor agreement with Bodine Electric. So when they have anything that's beyond changing a light bulb or routine matters, they call Bodine and say, here's the problem, fix it. Bodine fixes it. That's the facts. There was some reference to using the hospital's tools. How did that come up? That's another interesting characterization that's been made here today, Your Honor. The contract between the hospital and Bodine Electric says that Bodine will use its own tools. Now, when Augenbaugh and his foreman, Mayer, got to the hospital, they determined that this motor was burned out and they were going to have to pull it out and put a new motor in. Well, they didn't bring the tools with them to do that. They knew that the hospital owned a tool called a pulley puller that is one of the tools that they would need to do the work. So they said to the hospital, we need to use your pulley puller. The hospital said, okay, go use it. That is the context by which that one piece of equipment was used. All this other equipment was used. So the hospital never directed them to use our tools? That's absolutely right, Your Honor. They didn't know what tools needed to be used. Again, they're not the experts, and there's no evidence that they ever told Bodine you're going to do it this way or you're not going to do it that way. They don't know. They're not the experts. Do you think the record shows that Mayer, in advance, just knew about this backflow problem or knew that it could exist? His testimony is that, yeah, Ogdenbaugh and I knew about that, and that was his testimony. Ogdenbaugh says, no, we didn't know about it. That is their characterizations of what they knew or didn't know, but neither, regardless of which one of those people that you want to believe, it doesn't affect the fact that they were the ones in charge of determining what had to be done. It doesn't affect the fact that they were independent contractors who were not controlled by the hospital. Well, except it's interesting if Mayer knows because he's effectively the supervisor of Ogdenbaugh. They both work for the same company. That's right. He's the boss. And I suppose, Judge, that may be why when Bodine's safety director, Rhonda Moore, investigated this, she faulted both Ogdenbaugh and Mayer for not properly conducting a prehazard report to determine that this danger would have existed. She wasn't quite sure whether or not they knew that it did exist or if they believed that it didn't exist. Either way, she said, our employees were at fault because that's something they should have performed a prehazard assessment and they should have discovered that. And the safety director for Bodine was asked, did you fault the hospital in any way? No. Our employees should have figured this out. You heard Mr. Lynch argue about this lever which could have been pulled which would have averted some of this difficulty? The damper, yes. What is that all about? As I understand it, Your Honor, the duct system is in the shape of a Y with air coming down both arms of the Y down to the base of the Y. You close the damper, no air can come into the... As I understand it, Judge, you close the damper at the base of one of the Ys and it would keep still the air above it. Now, the reason that the existence of that damper became known was because after Mr. Bogganall was hurt, the hospital called in King Warr, which is another contractor. They did some repair work on motors. Their specialty is HVAC. And King Warr informed the hospital after the accident, well, you've got this damper on here, on this air duct which you could use to shut down the air. That was not the only way that the air could have been stilled. You could have turned off this other unit which would have done the same thing. Either way. But the evidence in this case is that it was Brian Lamb from King Warr, the HVAC subcontractor that informed everybody about the existence of this damper. Are you suggesting that there's no support in the evidence that the hospital personnel knew before the accident or before this report? I think the only evidence that anybody from the hospital was aware of the damper was possibly Robert Trollia. Mike Stoddsville said he was aware of a damper at the intake part of the air system, which would have been where the air is drawn in from the outside. That would not have done anything to shut off this movement of air if you closed those dampers. That's his testimony. Robert Trollia said, yeah, I believe there was a damper, but I also knew that you could shut down this other unit, and I told Chuck Mayer, the foreman, if you think you need to do that, you can do that. Just try to keep it off for less than an hour. What was the dispute from the plaintiff's witnesses about that testimony? What was the dispute? Was it disputed what Mayer said? About turning off the other unit for an hour if you need to? No. There's not been any contradictory evidence to that in the record. And, Your Honor, when he was asked, when Anambal was asked, if you believed that there was a safety concern or a hazard, what would you have done? He says, well, I would have talked to Chuck, Chuck Mayer. He's my boss, and we would have figured out a way to do it safely. He would not have checked with the hospital for his instructions on how to do the job. He would have gone to his foreman, another Bodine employee, and said, Chuck, I think there's a safety issue here. How are we going to do this safely? That's his testimony. So that shows several things. Number one, it is clear, and it is not disputable, that the hospital was not controlling the means and methods of these workers for Bodine. They made the decisions on how to do the work. Second of all, it shows that Chuck Mayer, the foreman, he was the one that was in charge of the plaintiff here, not the hospital. And Ogdenbaugh says, I would have checked with Chuck. So I think quite to the opposite of what has been argued by the appellant, the trial court did not lose its way here. I think the trial court examined all of this testimony very clearly and arrived at the correct determination that this is the classic example of an independent contractor who is doing its work without any interference or control by the hospital, and that there was no attempt and there was no evidence that the hospital did anything to control the means or methods by which the electrical expert contractor did the repair work. What about the argument here, Mr. Lynch, Mike, a summary of it being that even if it's true that the contract created this independence, that as things worked out, that the contract wasn't being followed. You heard his claim that the hospital exerted itself in regard to how the work should be done, etc. Any additional thoughts on that? Well, I think it's just an argument, Your Honor. I don't think the evidence supports the argument. All of the testimony, again, of the witnesses, it was very clear that the hospital did not interfere with how the electrical experts were going to do their job, and there's no evidence that they did. But the only argument, the only evidence that the plaintiff wants to try and rely upon is this offhanded comment made by Mike Stogsdill to Augenbaugh before Augenbaugh and his boss, Mayer, even knew what the problem was or how they were going to have to fix it, remove a motor. That conversation was never in the context of, that thing has to stay going no matter what you have to do to repair this. You can't turn that off. That was not the context by which that offhanded comment was made. Stogsdill wouldn't know whether or not that thing should be on or off for purposes of making the repair. He didn't know anything about fixing this kind of a problem. That's why he called in Bodine Electric. So with regard to this, I just don't think that there is any material evidence to support the argument that the hospital retained any kind of control here, which would be a rise to liability under the restatement. And I think Judge Little was absolutely correct in determining so. With respect to the general liability or the premises liability argument made by the plaintiff under Section 343 of the restatement, the problem with that argument is that the plaintiff has to allege and prove or adduce evidence at this stage of three factors, the most critical one of which is that the landowner should expect that the invitee will not discover or realize the danger or will fail to protect himself against it. His argument in effect is that the hospital, which is in the business of the healing arts, surgeries, that sort of thing, should know more about the potential dangers caused by taking out a motor and putting in a new one. They should know more about that than Bodine Electric, the electrical expert. The other thing that I think is very difficult to countenance in the argument is that the hospital should not only perceive dangers that the electrical experts won't, but that they should assume that the electrical experts won't understand the dangers that go along with their repair work on a motor. Rhonda Moore, the safety engineer, said our guys should have discovered this. They didn't do the prehazard assessment. Bodine's own employee faults the Bodine employees for not discovering the problem. That's why liability under section 343 of the restatement is not supportable or tenable in a case like this. It assumes that the hospital should anticipate problems that the electrical engineers are, by their training and experience, supposed to determine. So I think, unless the court has any other questions... Well, if I understand Mr. Lynch's point, going back to something you just mentioned a moment ago, it's not so much that the hospital was under a duty to find out what these problems were. It's that they knew it. So they already knew it, and they shouldn't have communicated it. Isn't that essentially what he argued? I think that may be part of his argument, but the only evidence regarding hospitals' knowledge of the potential safety issue was the testimony of Robert Trollia. And if the plaintiff wants to rely upon the testimony of Robert Trollia, and the plaintiff is also relying upon the fact that Trollia tells Mayer, if you believe you need to turn off this companion air handling unit when you're doing your repair work, do it. Just don't do it for more than an hour. That's the only person that had... Well, could this job be completed in an hour? I think the only thing that had to be done, Your Honor, was to just remove the defective motor. So does that answer my question, yes? Well, I think the question or answer is I don't know for sure how long that would have taken. And that isn't something that we need to be concerned about. I don't think so, because technically, or actually, the testimony of Robert Trollia was that you could turn it down in intervals, but less than an hour each interval. It wasn't suggested that you only have 59 minutes to do it. Just at any one time was his testimony. So... Thank you, Mr. Jackson. Thank you. Rebuttal? Thank you. Mr. Jackson gave an excellent argument, but it was a closing argument at trial where he asked you to weigh conflicting pieces of evidence. And again, this is, I think, where the trial court lost its way. Because the rule of summary judgment is that these questions about what the evidence was or was not are by law supposed to break in favor of the non-moving party. Here are some examples of what I'm talking about. There's been a lot of inquiry about whether or not Mr. Mayer testified that they knew or didn't know about the damper. The damper is a device that basically, I mean, we all have them, you know, we all have them in our car. When you don't want the air to come out of the top of the dashboard, you turn the damper and it goes down the bottom. There's a lever that they could pull, and the question was whether or not Mr. Mayer knew about that. And again, taking the evidence in the light most favorable to the plaintiff, Mr. Mayer testified, appendix page 166, page 11 of the deposition, after the fact they learned about the damper. I think I understand your point, but the questions I asked were directed about the backflow of air, not whether he knew about the damper, but whether there was, the record showed that Mayer was aware that when you had this situation, forgetting the damper, there could be a backflow. Mr. Jackson answered that by saying, yeah, and Mr. Offenbaugh said no. Right. But that's about the flow of air, which would cause the danger, not about the damper that might stop the danger. Right. And I think the next piece of evidence, well, the next thing I was going to say I think addresses that, and that is this. If you take that conflict amongst the evidence in the light most favorable to the plaintiff, you reach the conclusion that there is evidence they did not know. The next logical question, therefore, is did the hospital know? I think Mr. Jackson made a great argument, but I think that his dismissal of Mr. Trioli's evidence is the same kind of problem that we have in the whole case, and that is that he weighs one person's evidence, one witness's evidence against the other. Mr. Trioli wasn't equivocal about what he said. What he said is that he understood that one could use the damper to prevent the backflow, page 10 of his deposition. He knew there were air dampers that would stop the backflow and disable the backward-turning habit of the fan. That's on his deposition, page 9. He knew that both the blowers could be turned off, and that also would disable the backflow issue. If you take all those pieces of evidence in the light most favorable to the plaintiff, they knew about a danger. The hospital, through its agents or employees, knew about a danger that Mr. Rothenbaum did not. If you take Mr. Rothenbaum's evidence in the light most favorable to him, he was instructed, do not turn the other fan off. And most importantly, if you look at Trioli's testimony, I don't think he even had to take this in the light most favorable to the plaintiff. I mean, even if you do engage in the weighing evidence argument, the weighing evidence problem, you have a hospital employee who's saying this. I knew that it would happen. I knew that it could happen. I knew that air was going up there, and I also knew how to change it. And, you know, it didn't come to my mind at the time to tell him that. I just didn't think to turn the damper on, and I didn't tell him that we had one. You didn't tell either Chuck or Tim there was a damper? That's right. The option you gave them was turning the other motor off? Yes. This is his answer. Yes. And if the other motor had been turned off, that would have ceased, you know, air exchange completely. And we know also from other evidence that Stodgill didn't want that to happen. So what we have is we have some evidence from Mr. Meyer that says we didn't know about the damper, and you have testimony from a hospital employee that says we did. We knew it would stop the backflow. We knew that that would have kept Tim from being injured, but we didn't do it. I just didn't think of it. You know, a lot of this discussion has addressed the issue of retained control over the hospital, and I think that all this evidence is relevant to that point. But I think that is getting more than 50% of the consideration. The retained control argument has absorbed a lot of our attention, mine too. But in closing, I'd like to shift back to the Rule 343 argument, and that is if you have a property owner who invites someone onto their land, this is Section 343, knows of a danger and realizes that it involves an unreasonable risk, all of those things are present in Triola's testimony, and expects that the other side won't discover it, gee, I didn't tell him. It just didn't come to mind. I knew it would backflow. Off and Vaughn didn't, but I just didn't tell him. And they fail to exercise reasonable care to protect them, they're liable for premises liability. Retained control aside, it's just so easy. Thank you, counsel. Yes. We'll take the matter under advisement. Mr. Lynch, Mr. Jackson, I want to mention that this is an interesting case, and I want to thank you both. I thought you both gave excellent arguments today. Thank you very much. Thank you.